**FILED**

**April 11, 2017**

**IN COURT OF
WORKERS' COMPENSATION
CLAIMS**

**Time 9:03 AM**



## TENNESSEE BUREAU OF WORKERS' COMPENSATION
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
## AT KINGSPORT

| | | |
|---|---|---|
| Gary Burleson, | ) | Docket No.: 2016-02-0033 |
| Employee, | ) | |
| v. | ) | |
| | ) | |
| Doyle's Tire Service, Inc., | ) | State File No.: 10728-2015 |
| Employer, | ) | |
| And | ) | |
| | ) | |
| Federated Mutual Insurance Co. | ) | Judge Brian K. Addington |
| Carrier. | ) | |

---

### COMPENSATION HEARING ORDER

---

This matter came before the undersigned Workers' Compensation Judge on March 30, 2017, for a Compensation Hearing. Mr. Burleson brought this action for temporary and permanent disability benefits and medical benefits.

The central legal issues are 1) whether Mr. Burleson sustained an injury by accident to his right and/or left knees as a result of his work activities for Doyle's on February 9, 2015, and 2) whether Doyle's is responsible for the septic arthritis that Mr. Burleson suffered afterward.

For the reasons set forth below, this Court finds Mr. Burleson failed to establish by a preponderance of the evidence that he sustained a compensable work injury or that his septic arthritis arose as a result of his alleged accident. Accordingly, the Court holds that Mr. Burleson is not entitled to the requested workers' compensation benefits from Doyle's or its insurance carrier, Federated Mutual.

### History of Claim

Mr. Burleson is sixty-nine years old and worked as the truck center manager for Doyle's, a job he began in January 2007. As part of his duties, Mr. Burleson managed the

1

work of Doyle's mechanics and tire laborers. His job required him to be on his feet approximately half of his workday; the other half involved sedentary duties. Mr. Burleson is a college graduate who spent the majority of his work life in sales before working for Doyle's.

On February 9, 2015, a farmer brought a large tire to Doyle's for repair. It was a cold day, and Mr. Burleson asked the farmer to pull his truck to a garage bay door. All the bays were full, so he instructed a technician to quickly unload the large tire from the customer's truck, so that the bay door would not be open long enough to lose heat. When the technician delayed, Mr. Burleson got into the back of the truck himself and flipped the large tire out. Upon doing so, he felt a "pop" in his left knee. He did not initially feel pain, but informed the technicians that he would not be available to perform manual labor for the remainder of the workday.

According to Mr. Burleson, he mentioned the incident to Doyle's owner, Jerry Jones, and company representative, April Chyne, on February 9. They informed him that if he required medical treatment, he should be treated at Doctors Care.

The next day, Mr. Burleson's left knee swelled. After briefly reporting to work, he went to Doctors Care for treatment, where providers there referred him to Watauga Orthopedics. He returned to work to finish the workday.

According to Mr. Jones and Ms. Chyne, and contrary to Mr. Burleson's testimony, Mr. Burleson reported his injury to them on February 11, 2015. Mr. Burleson saw Watauga orthopedic surgeon Dr. Todd Fowler that same day. He later selected Watauga from a provided panel. (Ex. 3.) However, Doyle's provided no further medical treatment from February 17, 2015, forward, and formally denied the claim on March 19, 2015, on the basis that Mr. Burleson's complaints were not related to his work. Doyle's paid no temporary disability benefits. (Ex. 8 at 2.)

Mr. Burleson reported to Dr. Fowler that on February 9, he developed left-knee pain after twisting and lifting a 250-pound tire at work. X-rays indicated advanced patellofemoral arthritis. Dr. Fowler noted significant swelling in the left knee, aspirated 155 ccs of fluid from the joint, ordered an MRI, and placed Mr. Burleson in a left-knee brace.

The February 17, 2015 MRI showed a "functionally torn" anterior cruciate ligament (ACL) and a partial sprain of the medial collateral ligament (MCL). That same day, Dr. Fowler observed swelling in both of Mr. Burleson's knees and aspirated more fluid from the left knee, sending the aspirate for testing. Later that day, Mr. Burleson fell ill and was admitted to the hospital, where he was diagnosed with septic arthritis. Testing on the drained aspirate confirmed a staph infection, which had set up in both knees.

2

Dr. Fowler's partner at Watauga, Dr. Robert DeTroye, was on-call during Mr. Burleson's hospitalization. He performed a bilateral arthrotomy with irrigation and debridement, cleaning both knee joints of the infection. Shortly afterward, Mr. Burleson's left knee again swelled. Dr. DeTroye performed a repeat left-knee arthrotomy on February 27, 2015. Subsequently, Dr. DeTroye discharged Mr. Burleson to a rehabilitation clinic.

During his follow-up visit with Dr. DeTroye, Mr. Burleson reported "no history of rash or other skin lesion or any other source for the infection prior to the [February 9, 2015] injury." (Ex. 7 at 16.) Dr. DeTroye also noted that Mr. Burleson's condition was related to a work injury. *Id.*

Mr. Burleson underwent a third arthrotomy performed by Dr. DeTroye on May 5, 2015, and was admitted to the hospital again later that month. A different orthopedic surgeon at Watauga, Dr. David Wells, performed another surgery during the hospitalization.

After several follow-up visits, Dr. DeTroye determined that a deformity characterized by a shift in the knee developed in Mr. Burleson's left knee as a result of the infection eroding bone. He placed Mr. Burleson at maximum medical improvement (MMI). On December 17, 2015, Dr. DeTroye completed a Final Medical Report in which he found that Mr. Burleson sustained a twenty-six permanent impairment to the body as a whole as a result of his work injury.

Mr. Burleson testified during the hearing that he briefly returned to work for Doyle's in April 2015, and again in July. On July 16, 2015, Doyle's informed him that it had no work available for him until he recovered. On August 20, 2015, Dr. DeTroye determined that Mr. Burleson could return to his "primarily sedentary" job at Doyle's without restriction. (Ex. 7 at 66.) Mr. Burleson has not worked since his attempted return to Doyle's in July 2015. However, he continues to search for employment. Mr. Burleson wears a left-knee brace at all times and occasionally uses a cane. His right knee has largely recovered.

The parties acknowledged Mr. Burleson's compensation rate is $531.06. However, Mr. Burleson receives Social Security Old Age Insurance Benefits, and the parties did not agree as to any applicable offset under Tennessee Code Annotated section 50-6-207(4)(A)(i) (2016). During the Compensation Hearing, Mr. Burleson testified that he receives a net monthly Social Security benefit of $1,980.00. However, in his responses to Doyle's Requests for Admissions, Mr. Burleson admitted that his gross monthly Social Security benefit is $2,123.90 and that his net monthly benefit is $2,019.00. (Ex. 5 at 18.)

3

## Expert Medical Testimony

The parties produced the deposition transcripts of Dr. DeTroye, Dr. Lisle Whitman, and Dr. Juli Horton. Doyle's also produced a Form C-32 Medical Report from Dr. Glen Smith, who performed a medical records review. Pertinent here, the doctors primarily addressed the nature of Mr. Burleson's work injury, if any, as well as the cause of Mr. Burleson's staph infection.

### *Dr. Robert DeTroye*

Regarding causation, Dr. DeTroye testified:

> But it was my opinion that the twisting injury caused the onset of [Mr. Burleson's] problems. He was not having trouble with his knee prior to the injury that occurred on . . . February 9th 2015. The twisting injury probably aggravated or awakened a dormant infection around the [left] knee, and that spread to the other knee. He had no other signs of infection or preexisting problem with the left knee or the right knee that would account for the onset of the infection that occurred at the time of his knee injury.

(Ex. 7 at 17.)

According to Dr. DeTroye, Mr. Burleson's work accident caused an ACL tear, which led to the septic arthritis in both knees and the resulting surgeries. He stated that, within a reasonable degree of medical certainty, and considering all possible causes, Mr. Burleson's work accident was the primary cause of Mr. Burleson's bilateral knee condition. *Id.* at 18-19.

On cross-examination, Dr. DeTroye testified that septic arthritis was a "very common" condition that he treated in patients regularly. He explained his causation assessment as follows:

> I would say most likely that that [left-knee] joint was seeded by an infection and that's what caused the septic arthritis to develop. With the injury that he had, with the swelling, the swelling [sic], the effusion, the injury to the knee, that that made it susceptible to infection[.]... If you're talking about someone who has bacteria growing like in their nose or in their mouth, surgery or some type of trauma can become [a] nidus for an infection. It'll seed that joint.

*Id.* at 55-57.

Upon further questioning, the following colloquy ensued between defense counsel

and Dr. DeTroye:

> Q: We don't know if [Mr. Burleson] had staff in his body or not on February 9 of '15, correct?
>
> A: Correct.
>
> Q: All right. We know on February the 17th when the sample was taken, he had it in his body at that time?
>
> A: Correct.
>
> Q: Wherever he got that staph bacteria, whether it was there when he – on the 9th or whether it came in after, we don't know where it came from?
>
> A: Correct.
>
> Q: It's my understanding it's your testimony wherever that came from it set up in that joint? That, where he had the twisting of his knee.
>
> A: Correct. It's my testimony that if he had not injured the knee he would not have developed the septic arthritis.

*Id.* at 57-58.

Dr. DeTroye further testified the staph infection in Mr. Burleson's left knee migrated through the bloodstream and set up in the right knee as well, because "the knee is one of the most common joints to become septic." *Id.* at 59. According to Dr. DeTroye, "[The staph] had to come from some place. There was no break in the skin or anything that caused it to become infected." *Id.*

Dr. DeTroye acknowledged that the acute ACL injury that resulted from Mr. Burleson's twisting accident was not repaired as part of his ongoing treatment. Dr. DeTroye explained: "Because of the structuring of the knee joint and the arthritis that developed in that joint, they no longer seemed to be a problem, because the [left-knee] joint was so worn." *Id.* at 68. According to Dr. DeTroye, Mr. Burleson reached maximum medical improvement (MMI) for his work injury at the time of his last visit on December 3, 2015.

### *Dr. Lisle Whitman*

Dr. Whitman, an orthopedic surgeon, performed an Independent Medical Evaluation of Mr. Burleson on behalf of Doyle's on January 25, 2016. He both physically

examined Mr. Burleson and reviewed pertinent medical records. The parties deposed Dr. Whitman on November 7, 2016, after he reviewed the deposition transcript of Dr. DeTroye and a report prepared by Dr. Juli Horton, a board-certified infectious disease specialist, on Doyle's behalf.

Dr. Whitman reviewed Mr. Burleson's left-knee x-rays taken upon his initial presentation to Dr. Fowler on February 11, 2015, in addition to the first MRI. When asked whether the initial diagnostic exams of Mr. Burleson's left knee evidenced an acute injury, Dr. Whitman testified that Mr. Burleson had:

> [A]dvanced left patella femoral arthritis. That if anything is an understatement. He had no joint space remaining between the patella or kneecap and the femur in front of his knee. He has large bone spurs around the knee cap[.] . . . The changes in his knee are so advanced that it would take more than two days for those to develop[.] . . . I did not find any evidence in listening to the patient, examining the patient, or in review of the records that would indicate any structural change occurred within his left knee on February 9, 2015.

(Ex. 9 at 11-12.)

When asked directly about Dr. DeTroye's theory that the work injury "aggravated or awakened a dormant infection" in Mr. Burleson's left knee, Dr. Whitman disagreed, stating, "It just doesn't happen that way." *Id.* at 14. He explained that certain types of injuries could cause a staph infection:

> Well, if he had a penetrating injury to his knee, so if the knee, if there was – there has to be a vehicle coincident with the injury to bring the bacteria into the knee. He had no history of an infection in his knee that would have led to having dormant bacteria in his knee. He had no prior symptoms of the knee, pain in the knee. He had – the knee was not penetrated at the time of the injury. And I just don't find that this opinion meets the criteria for being plausible or a reasonable mechanism of causing this[.] . . .
>
> It is possible to develop a spontaneous infection – we see those in our practice – without a direct cause of the infection in the knee. It tends to happen more commonly with people who have some arthritis in their knee, and that's based on experience, not a literature source that I can tell you . . . And so it's my opinion that the most likely cause of this patient's presentation to medical care was an infection within his knee that arose spontaneously or without a mechanical cause.

*Id.* at 16-17.

When asked to state the likelihood of the work accident causing Mr. Burleson's septic arthritis, Dr. Whitman responded, "Less than five-percent chance." *Id.* at 21. He agreed with Dr. Horton's assessment that trauma would be an unlikely source of Mr. Burleson's septic arthritis. *Id.* at 23-24.

On cross examination, Dr. Whitman testified that he could not identify what caused Mr. Burleson's septic arthritis, saying:

> I mean it's a spontaneous – so if you're asking is there a reason he had septic arthritis the answer is no[.] . . . [I]t arose just because it did[.] . . . Everybody wants a cause for things that happen to them, and Mr. Burleson is no different. But things sometimes just happen. And he just got an infection.

*Id.* at 27.

Dr. Whitman also testified that Mr. Burleson likely did not tear his ACL as a result of the work accident, considering his initial medical treatment and report of symptoms. Dr. Whitman stated, "If you take all that together, then within a reasonable degree of medical certainty, more than 51% chance he did not tear his ACL in the manner described in the events of [February 9] 2015."*Id.*at 31.

### Dr. Juli Horton

Dr. Horton is a board-certified infectious disease specialist who performed a medical records review in this case at Doyle's request and prepared a corresponding report[1] dated September 19, 2016. She also reviewed the deposition transcripts of Dr. DeTroye and Dr. Whitman in preparation for her deposition testimony.

Dr. Horton testified that a twisting accident like the one Mr. Burleson experienced on February 9, 2015, is not the kind of trauma that leads to septic arthritis. She stated, "[I]t is an uncommon or even unrecognized mechanism of injury, to have a soft – to have a non-traumatic injury cause a septic arthritis. This is – this is not anything I've ever seen in my practice and seems inconsistent with the pathogenesis of disseminated or severe staphylococcal infections." (Ex. 10 at 10-11.)

According to Dr. Horton, direct, penetrating trauma, such as that inflicted by a nail gun, may lead to septic arthritis. The condition may also arise spontaneously "in patients who have preexisting immune problems or preexisting joint problems, they can get what

---

[1] Mr. Burleson asserted Dr. Horton's report should be disregarded due to typographical errors. The Court acknowledges there are typographical errors in her report but does not find they affect her opinion.

we call a primary septic arthritis without any kind of direct inoculation via trauma or through surgery, and can show up with a joint infection." *Id.* at 12.

When addressing causation, she stated, "I think the short duration of symptoms between the [work] injury and finding of infection – it seems in my mind too short for there to be a causal relationship." *Id.* at 13.

As to the timing of Mr. Burleson's knee infection, Dr. Horton determined that, given the amount of fluid repeatedly drawn from his knee shortly after the date of injury, Mr. Burleson likely already had a septic knee at the time he first presented for treatment on February 11, 2015. *Id.* at 15.

Dr. Horton challenged Dr. DeTroye's description of a "dormant" staph infection being "awakened" as a result of an injury, stating:

> I have a hard time wrapping my head around a dormant staph infection, because that's not a term or an entity that I believe exists[.] . . . Staph is not something that lives internally within us. Staph is on our skin. It has to travel from . . . outside in. So it's not something that's just sitting in the joint waiting to have some – something release it and cause problems.

*Id.* at 17.

In light of Mr. Burleson's health history, Dr. Horton determined that Mr. Burleson's left-knee staph infection arose spontaneously from an unknown source, given "the lack of other plausible events." *Id.* at 27.

On cross-examination, Mr. Burleson's attorney questioned Dr. Horton on an article he obtained from the American Society of Microbiology. The article included a statement asserting that "bacterial arthritis may arise secondary to penetrating trauma . . . or after trauma to a joint without an obvious break in the skin." Dr. Horton did not disagree with the sentence, but explained that in her opinion, "trauma" refers to a more severe incident than simply twisting. It refers to something more akin to "a blunt force trauma . . . causing a disruption of the skin integrity where bacteria are introduced." *Id.* at 32. She also questioned whether the article was medically authoritative, saying, "This might be good for microbiologists, but I'm not a microbiologist. I'm a practicing infectious disease physician." *Id.* at 42.

*Dr. Glen Smith*

Dr. Smith is a board-certified orthopedic surgeon who reviewed Mr. Burleson's medical records and prepared a Physician Advisor Review and C-32 Standard Form Medical Report. (Ex. 11.) Dr. Smith reviewed a variety of Mr. Burleson's medical

8

records from February and March 2015, but did not review the above-referenced reports/deposition transcripts of the other physicians who testified in this case.

While Dr. Smith concluded that Mr. Burleson's twisting injury on February 9, 2015, resulted in a left knee ACL tear, he determined that the septic arthritis was not work-related. He explained, "The patient would have to have other medical issues present supporting a septic arthritis. This would not have occurred from the simple injury reported. The medical records provided did not discuss a medical rationale that would support an infection occurring secondary to the twisting injury." (Ex. 11 at 12.)

## Parties' Assertions at the Compensation Hearing

At the Compensation Hearing, Mr. Burleson argued his bilateral septic arthritis and extensive associated medical treatment he received arose as a result of the February 9, 2015 work accident, as did the underlying ACL tear. He requested payment of past temporary disability benefits, reimbursement of all medical expenses, including his out-of-pockets incurred, and temporary total and permanent partial disability benefits, based on the permanent impairment rating from Dr. DeTroye, whom he considers his authorized provider.

Doyle's denied Mr. Burleson sustained a compensable work injury as a result of the lifting and twisting incident of February 9, 2015. It asserted Mr. Burleson's left-knee condition and the bilateral subsequent septic arthritis occurred as a result of his pre-existing and idiopathic condition, not as a result of any work activity or hazard. Doyle's argued that Mr. Burleson is not entitled to any of the requested workers' compensation benefits.

## Findings of Fact and Conclusions of Law

The employee in a workers' compensation claim has the burden of proof on all essential elements of the claim. *Scott v. Integrity Staffing Solutions,* 2015 TN Wrk. Comp. App. Bd. LEXIS 24, at *6 (Aug. 18, 2015). "[A]t a compensation hearing where the injured employee has arrived at a trial on the merits, the employee must establish by a preponderance of the evidence that he or she is, in fact, entitled to the requested benefits." *Willis v. All Staff,* 2015 TN Wrk. Comp. App. Bd. LEXIS 42, at *18 (Nov. 9, 2015);*see also* Tenn. Code Ann. § 50-6-239(c)(6) (2015) ("[T]he employee shall bear the burden of proving each and every element of the claim by a preponderance of the evidence.").

The initial question to be addressed is whether Mr. Burleson sustained a compensable injury as a result of his February 9, 2015 work activities. The testifying physicians in this case discussed two potential injuries: 1) a torn or sprained ACL and/or MCL in Mr. Burleson's left knee, and 2) the staph infection/septic arthritis in both of Mr. Burleson's knees.

Tennessee Code Annotated section 50-6-102(14) (2016) defines an "injury" in pertinent part as "an injury by accident . . . arising primarily out of and in the course and scope of employment that causes death, disablement, or the need for medical treatment of the employee."

Regarding the ACL/MCL injury, Dr. DeTroye and Dr. Smith both concluded that Mr. Burleson tore his ACL as a result of his twisting accident at work. However, Dr. DeTroye acknowledged that he never treated the ACL tear, because the "left knee joint was so worn" as a result of Mr. Burleson's arthritis. Dr. DeTroye's statement actually comports with Dr. Whitman's determination that Mr. Burleson suffered no structural change in his left knee as a result of the work accident. According to Dr. Whitman, the structural damage in Mr. Burleson's left knee, as revealed in his initial x-rays and MRI, was too advanced to have occurred as a result of an accident a few days before. Consequently, Dr. Whitman determined that Mr. Burleson did not injure his ACL in the twisting incident.

The fact that no physician treated Mr. Burleson's ACL condition during his substantial course of medical treatment is significant. By statutory definition, in order for a condition to qualify as an "injury," there must be an associated "need for medical treatment." Mr. Burleson's ACL and MCL injuries were not addressed medically and, therefore, do not comport with the statutory definition of "injury."

In addition, the Court credits Dr. Whitman's explanation that, whatever the condition of Mr. Burleson's ACL/MCL, it resulted from pre-existing and severe arthritis, not the alleged work accident. The Court reaches this conclusion without having to overcome Dr. DeTroye's contrary opinion. Doyle's argues that Dr. DeTroye was not Mr. Burleson's authorized treating physician, despite the fact that Dr. DeTroye is a partner at Watauga Orthopedics, and Mr. Burleson chose Watauga from the provided physician panel. Doyle's denied Mr. Burleson's workers' compensation claim and did not pay for his medical treatment after February 17, 2015. The only Watauga physician who provided treatment by that date was Dr. Fowler. Consequently, the only authorized physician in this case is Dr. Fowler, not Dr. DeTroye. Dr. DeTroye merely happened to be the orthopedic surgeon on-call when Mr. Burleson was admitted to the hospital on February 20, 2015. Dr. DeTroye's opinion on causation, therefore, is not entitled to a presumption of correctness under Tennessee Code Annotated section 50-6-102(14)(E) (2016).

In light of the above, the Court finds Mr. Burleson did not injure his ACL and/or MCL as a result of the February 9, 2015 work accident.

Mr. Burleson also argues that the bilateral septic arthritis/staph infection in his knees arose as a result of the subject work accident. Mr. Burleson bears the burden of

10

establishing by a preponderance of the evidence the causal connection between the work accident and the infection, considering all causes. Tenn. Code Ann. § 50-6-102(14)(B) (2016).

Dr. DeTroye, Dr. Whitman, and Dr. Horton each suggest a spontaneous eruption of the staph infection in Mr. Burleson's knees. Dr. DeTroye, however, determined that the twisting incident "awakened" the "dormant" staph that apparently was already located in Mr. Burleson's left knee at the time of the accident. Afterward, the blood-borne infection set up in Mr. Burleson's right knee. Dr. DeTroye added that Mr. Burleson "had no other signs of infection or preexisting problem with the left knee or the right knee that would account for the onset of the infection that occurred at the time of his knee injury."

Dr. Whitman, an orthopedic surgeon, and Dr. Horton, a board-certified infectious disease specialist, strongly disagreed with Dr. DeTroye's causation opinion. Dr. Whitman testified, "It just doesn't happen that way." Dr. Horton described Dr. DeTroye's theory as "an uncommon or even unrecognized mechanism of injury" for septic arthritis. Another orthopedic surgeon, Dr. Smith, agreed that Mr. Burleson's septic arthritis would not have occurred secondary to a simple twisting injury.

Both Dr. Whitman and Dr. Horton testified that a staph infection does not awaken from dormancy as the result of a twisting movement, but originates through either 1) a "penetrating injury" that breaks the skin, or 2) spontaneously from an unknown source. The latter typically occurs in persons with either immune deficiencies or joint ailments, such as arthritis.

Mr. Burleson did not experience a penetrating injury as a result of the work accident. Moreover, he had "no history of rash or other skin lesion or any other source for the infection" by which the staph could be introduced, according to Dr. DeTroye. Mr. Burleson did, however, have arthritis in his left knee. Given the documented degenerative state of Mr. Burleson's left knee shortly after the accident, Drs. Whitman and Horton found that he had an arthritic left knee before the date of injury and that the infection simply set up spontaneously. Dr. Horton arrived at this conclusion given "the lack of other plausible events." Dr. Whitman testified, "[I]f you're asking is there a reason he had septic arthritis the answer is no."

The Court finds the testimony of Drs. Whitman, Horton, and Smith, particularly on the issue of causation, more credible than Dr. DeTroye's. None of the testifying physicians has proven to the Court's satisfaction how the staph infection set up in Mr. Burleson's left knee. However, two board-certified orthopedic surgeons and a board-certified infectious disease specialist have stated that Dr. DeTroye's theory is not medically plausible. Importantly, it is not for Doyle's to prove an answer to the cause of Mr. Burleson's septic arthritis. Rather, it is Mr. Burleson's obligation to prove his septic

11

arthritis arose from the February 9, 2015 work accident. The Court finds that he has failed to do so.

Consequently, Mr. Burleson has not carried his burden to establish that he suffered a compensable injury while working for Doyle's on February 9, 2015, and his claim for all the requested workers' compensation benefits arising from that date of injury is denied.

### Alternative Findings

Solely in the event that an appellate body finds error in the compensability holding, the Court makes the following alternative findings for the sake of judicial economy. *See Cunningham v. Shelton Sec. Serv.,* 46 S.W.3d 131, 137-138 (Tenn. 2001). ("The trial court should . . . hear the entire case and make appropriate findings of fact, and alternative findings when necessary, for appellate review.")

Mr. Burleson's compensation rate is $531.06. The Court rejects Mr. Burleson's argument that the offset set forth in Tennessee Code Annotated section 50-6-207(4)(A)(i) (2016) should not apply to this case, because his injury is to a scheduled member. There are no "scheduled members" under the Reform Act of 2013, so the offset applies. Mr. Burleson receives benefits pursuant to the Old Age Insurance Benefit Program under the Social Security Act in the amount of $2,123.90 per month, or $493.93 per week. Mr. Burleson was self-employed for a period of five years and seven months of his fifty-year working history. Therefore, not all of his social security benefits were attributable to employer contributions. Consequently, Doyle's is only entitled to 44.4% offset in the amount of, $217.62 per week. Mr. Burleson's effective compensation rate is reduced to $313.44.

According to Dr. DeTroye, Mr. Burleson reached maximum medical improvement on December 3, 2015, and suffered a twenty-six percent impairment to his body as a whole. This is the only impairment rating provided in this case. Based on Dr. DeTroye's rating, Mr. Burleson is entitled to an initial award of benefits for a twenty-six percent permanent partial disability to the body as a whole, or 117 weeks of benefits beginning December 4, 2015. The period of compensation applicable to his claim under Tennessee Code Annotated section 50-6-207(3)(A) (2016) has not expired. Mr. Burleson may seek increased benefits, when and if appropriate, per Tennessee Code Annotated section 50-6-207(3) (2016).

The parties did not supply specific proof of the amount of wages Mr. Burleson earned from the date of injury until July 16, 2015, so the Court is unable to determine any temporary benefits owed during that period. However, there is sufficient evidence for the Court to determine Mr. Burleson is entitled to temporary total disability benefits from July 16, 2015, through August 20, 2015, the date on which Dr. DeTroye determined he

12

could return to his job at Doyle's. This is a period of five weeks and one day, which would result in a temporary total disability award of $2731.17.

Doyle's shall pay providers for the stipulated medical expenses incurred as a result of the February 9, 2015 work injury, including treatment for the ACL/MCL injury and for the septic arthritis in his bilateral knees, subject to the applicable Workers' Compensation Fee Schedule. The Court is unable to make a specific finding regarding out-of-pocket expenses related to this claim due to conflicting testimony from Mr. Burleson.

**IT IS, THEREFORE, ORDERED** as follows:

1. Mr. Burleson did not establish by a preponderance of the evidence that he sustained an injury arising primarily out of and in the course and scope of his employment. His claim for all requested benefits is denied.

2. Doyle's shall pay the $150.00 filing fee under Tennessee Compilation Rules and Regulations 0800-02-21-.07 (2016), for which execution may issue, if necessary.

3. Doyle's shall complete and file with the Bureau an SD-1 within ten days of this judgment.

4. This is a final judgment.

**ENTERED this the 11th day of April, 2017.**

**/s/ BRIAN K. ADDINGTON**
**HON. BRIAN K. ADDINGTON**
**Workers' Compensation Judge**

# APPENDIX

Technical record:
- Petition for Benefit Determination
- Dispute Certification Notice
- Request for Initial Hearing
- Initial Hearing Order
- Employer's Motion to Expand the Written Discovery and Deposition Deadlines
- Order Granting Employer's Motion to Expand Written Discovery and Deposition Deadlines
- Order Resetting Deadline for Discovery Motions
- Order on Motion to Compel and Amending Scheduling Order
- Employer's Motion to Compel Written Discovery or to Allow for a Supplemental Deposition of the Employee
- Employee's Response to Employer's Motion to Compel
- Post-Discovery Dispute Certification Notice
- Joint Notice of Filing Medical Records
- Employer's Motion in Limine to Exclude Employee's Acute Septic Arthritis Article Submitted as an Exhibit
- Employee's Notice of Serving Copies of Exhibits & Motions in Limine
- Employee's Motions in Limine
- Employer's Responses to Employee's Motions in Limine to Exclude Dr. Whitman's IME, Parts of Dr. Smith's C-32, Dr. Horton's Deposition

Stipulated Findings of Facts of the Parties:
- Mr. Burleson's compensation rate is $531.06 without accounting for any applicable Social Security offset.
- Mr. Burleson was sixty-eight years old at the time of the injury.
- Mr. Burleson worked for Doyle's since January 8, 2007.
- The alleged work injury occurred on February 9, 2015.
- Mr. Burleson notified Doyle's of his work injury no later than February 11, 2015.
- Mr. Burleson chose Watauga Orthopedics from the panel Doyle's provided.
- Medical bills to be paid per fee schedule or negotiated by employer/carrier if Mr. Burleson is successful on his claim

    Humana Subrogation---------------------$28,302.78
    State of Franklin-----------------------------$7,171.00
    Johnson City Medical Center--------------$1,750.00
    Quillen Rehab Hospital--------------------$ 1,040.00
    Mountain States Pharmacy-------------------$823.66
    Watauga Orthopedics------------------------$593.75
    ETSU Physicians------------------------------$86.00

14

Exhibits:

1. Mr. Burleson's résumé

2. Mr. Burleson's timesheet for the work week of February 9–15, 2015

3. Form C-42

4. Medical record from Doctor's Care

5. Employer's Requests for Admissions to Employee & Employee's Responses (Collective)

6. Employer's First Set of Interrogatories to Employee & Employee's Responses (Collective)

7. Transcript of Dr. Robert DeTroye's deposition

8. Employer's Response to Employee's Requests for Admissions

9. Transcript of Dr. Lisle Whitman's deposition

10. Transcript of Dr. Juli Horton's deposition

11. Form C-32 Standard Form Medical Report, Dr. Glen Smith

**The Court's Rulings on Motions in Limine**

*Mr. Burleson's Motions in Limine*

1. Motion to exclude from trial the medical report of Dr. Lisle Whitman as hearsay. The subject medical report was included as an exhibit to Dr. Whitman's deposition testimony without objection. Dr. Whitman testified and was questioned regarding the report. Mr. Burleson's attorney cross-examined Dr. Whitman during the deposition. For these reasons, the motion is denied.

2. Motion to exclude the "Physician Advisor Review" attached to Dr. Glen Smith's C-32 as hearsay. Dr. Smith attached the "Physician Advisor Review" as part of his answers to the C-32, just as he attached his C.V. Mr. Burleson did not timely object to the C-32 or any of its attachments in accordance with Tennessee Code Annotated section 50-6-235(c)(2) (2016). Therefore, the motion is denied.

15

3. <u>Objections stated during Dr. Whitman's deposition</u>. For the purposes of judicial economy, the Court asked Mr. Burleson to identify in the lengthy deposition transcript upon which objections he wished the Court to rule. Mr. Burleson did not respond to the Court's inquiry. Without a more particular statement concerning the objections, the Court declines to rule on the objections. Therefore, the motion is denied.

4. "<u>Dr. Juli Horton's deposition – Rule 26.02.</u>" Mr. Burleson failed to state what action he moves the Court to take. Mr. Burleson asserts that Doyle's failed to produce a statement of the compensation it paid to Dr. Horton for her expert testimony, and presumably, asks the Court to exclude her testimony as a result. The Court finds that Doyle's provided Dr. Horton's invoice as a late-filed exhibit to her deposition. Furthermore, Mr. Burleson failed to state sufficient grounds upon which the Court may exclude Dr. Horton's testimony pursuant to Rule 26.02 of the Tennessee Rules of Civil Procedure. The motion is denied.

5. <u>Dr. Horton's testimony due to her refusal to produce correspondence between her and Doyle's attorney, which Mr. Burleson requested during her deposition</u>. During Dr. Horton's deposition, Mr. Burleson's attorney asked Dr. Horton to compile emails she received from Doyle's attorney and make them a late-filed exhibit to her testimony. Doyle's attorney did not object, and the late-filed exhibit was to be marked Exhibit 4. In subsequent written discovery, Mr. Burleson did not request the emails, nor did he file a Motion to Compel concerning them. While the emails arguably should have been provided, under the circumstances, the Court declines to take the extraordinary measure of excluding Dr. Horton's testimony on such a basis. The motion is denied.

### *Doyle's Motion in Limine*

1. <u>Motion to exclude as an exhibit to Dr. Horton's deposition the septic arthritis article Mr. Burleson provided</u>. During Dr. Horton's deposition, Mr. Burleson questioned her on an article concerning septic arthritis, published by the American Society for Microbiology. Doyle's objected to Mr. Burleson's attempt to make the article an exhibit to the deposition, citing a lack of foundation and hearsay. Dr. Horton testified that the article was not medically authoritative, and Mr. Burleson provided no other expert testimony to establish the article's authority. Moreover, Rule 618 of the Tennessee Rules of Evidence (2016) states that a party may question an expert on statements made in a published treatise only when that treatise is first recognized by the witness, another expert, or upon judicial notice as authoritative. With no such foundation laid, the Court finds that the article should be excluded as an exhibit to Dr. Horton's deposition. The motion is granted.

16

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Compensation Hearing Order was sent to the following recipients by the following methods of service on this the 11th day of April, 2017.

| Name | Certified Mail | Fax | Email | Service sent to: |
|---|---|---|---|---|
| Robert Bates, Esq., Employee's Attorney | | | X | rbates@tonyseaton.com jewel@tonyseaton.com |
| Brett Burrow, Esq. Employer's Attorney | | | X | bburrow@burrowlee.com swilson@burrowlee.com |

/s/ Penny Shrum

**PENNY SHRUM, COURT CLERK**
wc.courtclerk@tn.gov